**AFFIRMED and Opinion Filed September 20, 2021**



**In The**

**Court of Appeals**

**Fifth District of Texas at Dallas**

_____

**No. 05-21-00183-CV**
_____

**IN THE INTEREST OF L.J.H., A CHILD, AND
IN THE INTEREST OF I.D.H. AND M.D.H., CHILDREN**

**On Appeal from the 354th Judicial District Court
Hunt County, Texas
Trial Court Cause No. 85395**

## MEMORANDUM OPINION

Before Justices Partida-Kipness, Pedersen, III, and Goldstein
Opinion by Justice Goldstein

Appellant C.T.H. (CH) appeals from two orders issued after a bench trial in consolidated suits adjudicating CH's divorce from N.M.H. (NH), and the parent child relationships of L.J.H., I.D.H., and M.D.H, all biological children of CH. The trial court issued an order terminating CH's parental rights to his three children and an order granting lifetime protective orders in favor of the three children and their respective mothers, NH and B.P-S. (BPS). CH presents four complaints on appeal: 1) he was denied due process due to judicial bias; 2) the trial court abused its discretion in failing to appoint an amicus or ad litem attorney for the children; 3) the evidence was legally and factually insufficient to support termination of his parental

rights pursuant to Texas Family Code section 161.001(b)(1)(C), (D), (E), or (F); and 4) the evidence was insufficient to justify issuance of a lifetime protective order for the three children. We affirm the trial court.

## I.	BACKGROUND

CH met BPS in 2009, and after approximately six months of dating, she became pregnant and moved into his parents' home. CH and BPS never married and had two daughters, I.D.H. and M.D.H. In this proceeding, BPS described living conditions in the home as deplorable. She described CH as abusive, including to pets, and that she felt trapped and unable to leave the relationship. CH described BPS as irresponsible. Each accused the other of infidelity. CH joined the National Guard. When he left for basic training in 2013, BPS took the girls and moved to her mother's home in Oklahoma. After CH returned from the military, he sought and was granted primary possession of I.D.H. and M.D.H.

NH lived with her mother and stepfather across the street from CH's parents while she attended college to complete her teaching degree. CH and NH dated, then married in January 2015. I.D.H. and M.D.H. lived in their household, and BPS drove from Oklahoma for weekend visitation. CH was employed at the county jail. NH described CH's volatile behavior, often accompanied by alcohol and drug use, detailing multiple instances of verbal, emotional, and physical abuse toward NH and the children, some of which CH denied were abusive and some he denied occurred.

After becoming pregnant in 2017, NH detailed CH's escalating substance use and violent behavior, including threats to kill her and of suicide. L.J.H. was born in September 2017 and NH disclosed some of CH's alleged abusive behavior to a social worker at the hospital. The social worker notified the Texas Department of Family and Protective Services (DFPS), who sent an investigator to their home the day after NH's discharge. This visit resulted in CH and NH signing an agreement with DFPS on September 13 that required, among other things, for CH to undergo a psychological evaluation and follow the assessment recommendations and for NH to obtain services at a local battered women center. NH alleges CH sexually assaulted her two days later in retaliation for her reports of prior abuse to DFPS. CH underwent the psychological evaluation but did not follow through with the doctor's recommendations for therapy nor refill the prescribed medication.

On November 7, 2017, NH filed for divorce and filed an application for a protective order for the protection of NH, I.D.H., M.D.H. and L.J.H. NH sent I.D.H. and M.D.H. to stay with BPS in Oklahoma. BPS had joined the Navy and recently married. She and her husband now have twin girls in addition to I.D.H. and M.D.H.

The court heard NH's request for a protective order on December 1, 2017 and made oral findings on the record, granting the requested protective order. CH was not allowed visitation with the children until further orders of the court after completion of psychological evaluations and home studies. The court signed the

two-year protective order on December 4, 2017, which additionally required that CH complete an accredited battering intervention and prevention program.[1]

On October 1, 2018, BPS filed a petition to terminate CH's parent-child relationship with I.D.H. and M.D.H. On October 10, NH filed a petition to terminate CH's parent-child relationship with L.J.H. The suits were consolidated. Prior to the trial, NH filed a supplemental application to extend the protective order for the lifetime of NH and the three minor children.

The parental rights termination bench trial, held via Zoom, began August 25, 2020, continued seven subsequent days, concluding on December 8, 2020. The trial court made oral findings on the record, granting a lifetime final protective order in favor of NH, I.D.H., M.D.H., and L.J.H. against CH and terminating CH's parent-child relationship with all three children. The trial court entered a Final Decree of Divorce, an Order of Termination, and a Lifetime Final Protective Order on March 18, 2021.

## II. JUDICIAL BIAS

In his first point of error, CH asserts the trial court deprived him of his due process right to a fair and impartial trial by abandoning its role as neutral factfinder, applying heightened standards to CH's behavior, and considering extrajudicial

---

[1] Over the course of those two years CH moved to modify or dismiss the protective order asserting completion of all court-ordered requirements to allow access to his children. NH moved to enforce the protective orders. A hearing was held on May 29, 2019, that did not result in an order. On December 2, 2019, the Court issued an Agreed Order Extending the Final Protective Order to the trial date.

sources. The record reflects that numerous neutrality challenges pre-date the trial by three years having occurred at the first protective order hearing, and in the interim, CH neither sought to recuse the trial judge nor objected to the court's alleged bias or prejudice.

### A. Applicable Law

Due process requires a neutral and detached hearing body or officer. *Brumit v. State*, 206 S.W.3d 639, 645 (Tex. Crim. App. 2006) (citing *Gagnon v. Scarpelli*, 411 U.S. 778, 786 (1973)). *Ellason v. Ellason*, 162 S.W.3d 883, 887 (Tex. App.—Dallas 2005, no pet.) (parties have a right to a fair trial before an impartial judge). "'[J]udicial rulings alone almost never constitute a valid basis for a bias or partiality motion' and that the opinions a judge forms during a trial do not call into question a judge's bias or partiality 'unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible.'" *Song v. Kang*, No. 02-18-00375-CV, 2020 WL 1808487, at *7 (Tex. App.—Fort Worth Apr. 9, 2020, pet. denied) (mem. op.) (quoting *Liteky v. United States*, 510 U.S. 540, 555 (1994)). Critical, disapproving, or even hostile judicial remarks during trial to counsel, the parties, or their cases do not ordinarily support a bias or partiality challenge. *Liteky*, 510 U.S. at 555. "Expressions of impatience, dissatisfaction, or annoyance do not establish bias or partiality." *Morgan Keegan & Co., Inc. v. Purdue Ave. Inv'rs, L.P.*, No. 05-15-00369-CV, 2016 WL 2941266, at *9 (Tex. App.—Dallas May 18, 2016, pet. denied) (mem. op.) (citing *Liteky*, at 555).

The trial court has broad discretion over the conduct of a trial and may properly intervene to maintain control in the courtroom, to expedite the trial, and to prevent what it considers to be a waste of time. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 240 (Tex. 2001) (per curiam); *Morgan Keegan*, at *9; *Song*, at *8. The trial judge has a duty to direct "competent and material questions to a witness in order to clarify testimony or to elicit testimony that has not otherwise been brought out," and that such practice is "especially proper" in a bench trial where the best interests of children are at issue. *See Interest of A.T.M.*, No. 13-21-00008-CV, 2021 WL 2584402, at *17 (Tex., App.—Corpus Christi-Edinburg June 24, 2021, no pet.) (mem. op.) (citing *Trahan v. Trahan*, 732 S.W.2d 113, 114–15 (Tex. App.— Beaumont 1987, no writ) (holding right to an impartial judge was not violated where the trial court asked many more questions than either of the attorneys).

## B.  Application of Law to Facts

We apply these principles to this case, and after carefully examining the judge's allegedly improper comments, extrajudicial considerations, and admission of custody evaluation, in the context of the entire record, we conclude there is no evidence of judicial bias. The record reflects that the judge exercised her broad discretion to maintain control over highly emotional and contentious proceedings.

CH's allegations of judicial bias occurred during two separate proceedings, three years apart:  at a December 1, 2017, protective order hearing and the 2020 trial on the merits.   Recognizing that each of the trial court's remarks or actions standing

alone would not constitute a due process violation, CH argues that viewed in the aggregate, the trial court's actions evidence bias depriving him of a fair and impartial trial.

### December 1, 2017, Protective Order Hearing

CH raises, for the first time on appeal, statements and conduct that occurred three years before trial.[2] Based upon a review of the entire record, finding no structural error that probably caused the rendition of an improper judgment, we find that CH's complaints are subject to waiver.

CH asserts several instances where the court interrupted counsel and directly questioned him, as well as other witnesses, in an allegedly antagonistic manner. CH also directs our attention to the judge's admonishment after granting the protective order. No objection was made to any of these exchanges.

CH avers that the trial court left its neutral role when she actively questioned CH regarding taking home videotape of inmates, the contents of a note he left for NH upon being served with the protective order, and not permitting counsel to question a witness.

To establish error, CH must demonstrate that the judge's comments show "a deep-seated favoritism or antagonism that would make fair judgment impossible." *Song*, at *7 (quoting *Liteky*, at 555). In the first complained of exchange, the judge

---

[2] CH proceeded to the bench trial without objection, motion to recuse, or jury trial request.

directly questioned CH regarding inmate videos shown to NH, and to his responses asked if CH was "trying to be cheeky," advising that he was going to "piss her off." A trial court's expression of frustration after instructing a party to stop giving nonresponsive answers and the court's announcement of a break for counsel to talk with their client about his responsiveness did not establish bias or prejudice. *In re A.E.A.*, 406 S.W.3d 404, 421 (Tex. App.—Fort Worth 2013, no pet.) (rejecting argument that trial court's statement father was "irritating" the judge demonstrated bias that affected the court's rulings). The record shows the trial court was trying to elicit further detail about the content of the videos and responding to CH's answers through a very direct line of questioning.

A trial judge's questioning of the father that included intemperate characterizations of his testimony as "ridiculous" and "crap," in addition to threats to have the father prosecuted, revealed "that all impartiality had been irretrievably lost." *In Interest of L.S.*, No. 02-17-00132-CV, 2017 WL 4172584, at *20 (Tex. App.—Fort Worth Sept. 21, 2017, no pet.) (mem. op.). The appellate court concluded that the trial court's "entire course of conduct, which constituted more than isolated remarks on the record or unfavorable rulings, revealed his deep-seated antagonism against Father that had its apparent genesis in [a] prior and separate termination proceeding regarding [two other children], neither of which were Father's children." *Id.*, at *17-18 (finding that the trial judge "badgered DFPS into seeking termination [after DFPS had stated that it had no grounds to do so] because

the judge, who was sitting as the fact-finder, had already determined that Father was noncompliant and would never be complaint").

CH argues that the trial court repeatedly improperly reproved him by admonishing CH for opposing counsel's offending conduct, changing CH's testimony through its restatement, ordering another psychological examination with Dr. Albritton even though an unobjected to psychological examination had been completed, and categorizing CH as having an intimidating stare. After granting the protective order, the court admonished CH as follows:

> THE COURT: All right. Mr. Holcombe, these are very, very serious accusations.
> RESPONDENT: Yes, ma'am.
> THE COURT: Extremely serious.
> RESPONDENT: Yes, ma'am.
> THE COURT: Extremely concerning to me.
> RESPONDENT: Yes, ma'am.
> THE COURT: Especially for the position that you hold here in Hunt County, and the fact that you were willing to violate the trust of the sheriff's department and take home information that's recorded about inmates and show it to other people tells me that you probably don't need to be in that job.
> RESPONDENT: Yes, ma'am.
> THE COURT: I'm the person who has to protect the rights of those individuals who are being held in custody, and you are violating their constitutional rights.
> RESPONDENT: Yes, ma'am.
> THE COURT: That is a complete disregard for other people.
> RESPONDENT: Yes, ma'am. I apologize.
> THE COURT: Unprofessional, unethical, inappropriate behavior. Do you understand that, sir?
> RESPONDENT: Yes, ma'am.
> THE COURT: That's above and beyond all of the other physical allegations that have been contained in this argument and presentation to the Court.

RESPONDENT: Yes, ma'am.
THE COURT: You need to get some help. You need to get a psychological, and we need to figure out what's going on with you.
RESPONDENT: Yes, ma'am.
THE COURT: I can't let you near these children until something else happens. Do you understand that, sir?
RESPONDENT: Yes, ma'am.
. . . .
THE COURT: The very fact that we have to be sitting here in a courtroom with these kind of accusations should be very disturbing to you.
RESPONDENT: Yes, ma'am.
THE COURT: All right?
RESPONDENT: Yes, ma'am.
THE COURT: Fix whatever this problem is.
RESPONDENT: Yes, ma'am.
THE COURT: I am so disappointed. You guys are held to a higher standard. You know that. Everyone who works in this office who is a public employee who works for the citizens of Hunt County are held to a higher standard. You are supposed to be above the fray, not in it.
RESPONDENT: Yes, ma'am.
THE COURT: We're supposed to be able to look to you as an example. I can't do that today, and that's shameful to me.
RESPONDENT: Yes, ma'am

The entire record reflects the judge's concern with the impropriety of taking home sensitive inmate videos. We find this exchange alone does not rise to the level of showing incurable judicial bias.

CH contends that, while any one of these cited examples of bias may not rise to the level of a due process violation, the cumulative effect of all the trial court's inappropriate actions leaves CH's "right to a fair trial to die of a thousand paper cuts," and because granting lifetime protective orders and parental rights termination involve constitutional rights, the entire record should reflect that he received a fair and impartial trial by a neutral fact finder.

The alleged evidence of the court's deep-seated antagonism occurred at the December 1, 2017, protective order hearing, almost three years prior to the termination of parental rights trial. The record shows that CH was represented by counsel at the protective order hearing and at the parental rights termination trial that commenced on August 25, 2020 and ended on December 8, 2020. At no time during the proceedings or in the intervening three years did CH or his counsel raise the alleged judicial deep-seated antagonism by moving to recuse, exercising the right to a jury trial, or objecting on any basis. A thorough review of the entire record reflects no other exchanges[3] or statements during any of the proceedings that would indicate CH was deprived of an impartial factfinder that resulted in an improper judgment.

## 2020 Trial on the Merits

CH alleges three instances reflecting the trial court improperly considered information derived from an extrajudicial source.

CH contends the trial court was "privy to information not presented in the courtroom through the proper presentation of evidence" because NH's counsel, in her opening statement, advised the court that CH was terminated from the Hunt County Sheriff's Office for taking material from the Hunt County jail and showing it to NH. At time of opening, no evidence of CH's termination had been presented

---

[3] In fact, the record reflects the court's concern about maintaining control, recognizing the highly emotional nature of the proceedings and admonished counsel not to "jump into it" on the threat of contempt.

–11–

on the record nor part of an agreed, pre-admitted exhibit. No objection was made to counsel's opening and therefore this complaint was not preserved for appeal.[4]

During CH's counsel's cross-examination of BPS about statements made to a "Dr. Kweller" regarding the social study performed in the prior custody case, BPS's counsel objected to the reference to "Dr. Kweller" because the custody evaluator was a social worker and not a doctor. The trial court responded that D. Kweller (married to Dr. Kweller) is well known in Hunt County and frequently called Dr. Kweller. The court acknowledged D. Kweller had a degree in social work and took judicial notice of her qualifications listed in the social study filed with the court. No objection was made by CH's counsel, D. Kweller was not a witness at trial, and her last involvement with the parties was in 2014.

The final example of alleged improper extrajudicial information involved Mrs. Chapman, a witness called to testify on behalf of CH. The judge acknowledged she knew Mrs. Chapman, the basis for that knowledge, stating she could be fair and impartial relative to her testimony. CH did not object to the court's explanation.

While an opinion derived from an extrajudicial source is a factor to consider in determining whether a judge is biased, the fact that an opinion derives from an extrajudicial source is not a sufficient condition to show bias or prejudice, as some opinions acquired outside the context of judicial proceedings, such as the judge's

---

[4] CH's employment circumstances had changed by the time of trial, and CH had the opportunity to share his version of events relevant to his departure from the Hunt County Sheriff's Office at trial. There is no evidence of incurable bias excusing waiver.

view of the law acquired in scholarly reading, are no evidence of bias. *See Liteky*, 510 U.S. at 554-55. While the judge's statements reveal personal knowledge derived from outside the proceedings about a custody evaluator and a witness, CH has failed to show how the acknowledgement and associated explanations indicate bias or prejudice and the record reflects none. We find that the court's clarification of credentials of the author of a report unfavorable to BPS and proper disclosure of a friendship with a witness, to avoid the appearance of impropriety, without objection, did not result in the rendition of an improper judgment.

CH also complains the court erred in admitting Dr. Albritton's custody evaluation into evidence prior to family code requirements being met. *See* TEX. FAM. CODE ANN. § 107.109(b). CH acknowledges the trial court recognized the requirement that a doctor evaluate children in the presence of the parents and the judge would allow cross-examination on the alleged deficiency in Dr. Albritton's report. CH admits there was no harm stemming from the trial court's decision to admit the report because Dr. Albritton's testimony cured the complained of error by providing an explanation for the report's deficiency. Still, CH offers the trial court's decision to admit the report before Dr. Albritton testified as further evidence showing "a continued course of conduct by the trial court of favoring Petitioner and being antagonistic to Appellant."

CH argues the cumulative effect of the court's rulings, extrajudicial considerations, in conjunction with the court's admonishing his behavior as not

befitting a public employee, show that the court applied a higher standard to his actions that he likens to applying an incorrect burden of proof. At least one court refused to consider the cumulative effect of a trial court's allegedly erroneous rulings as evidence of bias after finding that no individual due process violations were apparent on the record. *A.E.A.*, 406 S.W.3d at 421.

A thorough review of the entire record reflects the trial court's efforts to maintain control over highly emotional proceedings. Based upon the entire record before this court, we conclude there are no apparent individual due process violations and, in the aggregate, no evidence of a deep-seated antagonism or judicial bias. Upon review of the record before us, we do not find evidence that the trial court harbored a deep-seated antagonism that deprived CH of his due process right to a fair trial with an impartial factfinder. Accordingly, we find that CH's complaints of judicial bias did not rise to the level of a structural error, were not preserved, and are waived. Issue One is overruled.

## III. Failure to Appoint Amicus Attorney or Attorney Ad Litem

In his second issue, Appellant contends that the trial court abused its discretion in failing to appoint an amicus attorney or attorney ad litem for the children as required by Texas Family Code, Sec. 107.021 (a-1). Appellees stand on the trial

–14–

court's findings that the mothers could adequately represent the interest of the children.[5]

> The family code provides:
> (a–1) In a suit requesting termination of the parent-child relationship that is not filed by a governmental entity, the court shall, unless the court finds that the interests of the child will be represented adequately by a party to the suit whose interests are not in conflict with the child's interests, appoint one of the following:
> (1) an amicus attorney; or
> (2) an attorney ad litem.

TEX. FAM. CODE ANN. § 107.021(a–1). Thus, the statute contemplates one party in a private suit may adequately represent the child's interests, so long as that party's interests are not in conflict with those of the child. The trial court specifically so found in the Order of Termination entered March 18, 2021[6]:

> This Court finds that [NH], a party to the suit, has no interest adverse to the child, L.J.H., the subject of this suit and would adequately represent the interests of the child, L.J.H. No attorney ad litem or amicus attorney was necessary, and none was appointed for L.J.H.
> The Court finds that [BPS], a party to the suit, has no interest adverse to the children, I.D.H. and M.D.H, the subject of this suit and would adequately represent the interests of the children, I.D.H. and M.D.H. No attorney ad litem or amicus attorney was necessary, and none was appointed for I.D.H. and M.D.H.

---

[5] With respect to Appellees' additional argument, without concomitant citation to statutory or jurisprudential authority, that the role of the expert appointed to conduct the comprehensive social study and psychological evaluation of all parties "was more akin to the role of ad litem, but exceeded what an ad litem could do," we decline to conflate the roles. The alleged justification was not raised before the trial court as a basis to waive the requirement and therefore not considered as part of the record.

[6] No Findings of Fact or Conclusions of Law were requested. The only recitations before this Court are those outlined in the Order of Termination.

–15–

We review the trial court's determination as to whether there was a conflict for an abuse of discretion. *See In re B.L.D.* 113 S.W. 3d 340, 347 (Tex. 2003), *cert. denied* 541 U.S. 945 (2004); *In re C.A.P.*, No. 04–12–00553–CV, 2013 WL 749825, at *2 (Tex. App.—San Antonio Feb. 27, 2013, pet. denied) (mem. op.) (section 107.021(a–1) reviewed for abuse of discretion). The trial court must determine whether there is a substantial risk that the mothers had an interest adverse to the child that would prevent each from adequately representing their child's interest. *Id.*

The children's best interest is at the heart of the attorney ad litem or amicus attorney appointment requirement, the mandatory language being associated with the unique adversarial nature of private termination proceedings. Private terminations present a particular adversarial proceeding litigating the personal self-interest of the parents involved.[7]

Generally, we will not consider errors not timely raised in the trial court. TEX. R. APP. P. 33.1(a). There is no dispute CH failed to object or raise the issue with the trial court. CH fails to cite to the record reflecting any interest of NH or BPS adverse

---

[7] *In Interest of D.M.O.*, No. 04-17-00290-CV, 2018 WL 1402030, at *2 (Tex. App.—San Antonio Mar. 21, 2018, pet. denied) (mem. op.) ("[W]e conclude a complaining party may raise a trial court's failure to appoint an attorney ad litem or amicus attorney when required by Section 107.021(a–1) for the first time on appeal."). "[I]t has been recognized that where parents are adversaries in a suit to terminate one parent's rights, the trial court can seldom find that one party adequately represents the interests of the children involved or that their interests are not adverse." *In re K.M.M.*, 326 S.W.3d 714, 715 (Tex. App.—Amarillo 2010, no pet.) (holding the failure to abide by §107.021 may be raised for the first time on appeal and without a finding on the record that the mother could adequately represent the child, the appointment of either an amicus attorney or attorney ad litem was mandatory). The *B.L.D.* analysis outlined herein was not conducted in either case. The expert's case report reflects the personal self-interests involved. The record is replete with evidence of the adversarial and emotional nature of this litigation and the personal self-interests asserted in this cause between the parents.

to the children, failed to raise the issue or lodge an objection with the trial court, or request additional findings of fact, relying solely on the adversarial nature of the proceeding between the parents. Any conflicts between the mothers' interests and the children which precluded the mother from adequately representing the children's interest was present from the inception of the case. CH failed to preserve error.

CH asserts that such failure to appoint may be raised for the first time on appeal relying on *Turner v Lutz*, 654 S.W.2d 57, 58 (Tex. App.—Austin, 1983, no writ) and *Arnold v. Caillier*, 628 S.W.2d 468, 469-70 (Tex. App.—Beaumont 1981, no writ). We disagree based upon the supreme court's and this court's binding precedent. *See In Re B.L.D.*, 113 S.W.3d 340 (Tex. 2003) and *Interest of A.E.J.,* No. 05-20-00340-CV, 2020 WL 5107293 (Tex. App.—Dallas Aug. 31, 2020, pet denied) (mem. op.). This court rejected the conclusion under *Turner,* applying instead the mandated due process analysis to unpreserved complaints and waiver in the context of the failure to appoint an attorney ad litem in a parental termination case. *See A.E.J.*, at *12-13 (applying *B.L.D.* analysis to conclude that the father's failure to timely object to the trial court's refusal to appoint an ad litem attorney waived the issue.).[8] We similarly do so here.

---

[8] In *A.E.J.* we reasoned "In *B.L.D.*, the Texas Supreme Court considered whether a parent subject to a termination proceeding waived charge error by failing to timely object. 113 S.W.3d at 340. The court first recognized the important prudential considerations underlying preservation of error rules, including fairness among litigants and conserving "judicial resources by giving trial courts an opportunity to correct an error before an appeal proceeds." *Id.* at 350. It also determined that despite the constitutional importance of parental rights, those rights did not implicate the fundamental error doctrine, which provided an exception to our preservation of error rules. *Id*. at 350–51. Because termination cases nonetheless implicate

–17–

Balancing the three *Eldridge* factors—the private interest, the risk of erroneous deprivation of that private interest through the procedures at issue, and the competing governmental interest—did not rebut the presumption that "our error preservation rules comport with due process." *A.E.J.*, at \*12 (citing *B.L.D.* at 354).

CH's "fundamental liberty interest in the care, custody and control of his children" favors reviewing unpreserved error. The competing interest of the best interest of the child (generally the State's interest), favors reviewing unpreserved error if necessary to ensure an "accurate and just decision*." Id.* at \* 12 (citing *B.L.D.,* at 353). The best interest of the child requires a heightened concern for judicial economy manifested as a prompt and final resolution of termination cases, and the State's interest includes ensuring trial courts have an opportunity to correct their own errors. *Id*. Those competing interests weigh against allowing review of unpreserved error and equalize the competing interests. *Id.*

---

"fundamental liberties," the court acknowledged the due process—fundamental fairness—requirements inherent in the proceedings. It observed the presumption that "our rules governing preservation of error in civil cases comport with due process," *Id*. (citing *Lassiter v. Dep't of Soc. Servs*., 452 U.S. 18, 27 (1981), and *Whitworth v. Bynum*, 699 S.W.2d 194, 197 (Tex. 1985) ("A court begins by presuming a statute's constitutionality, whether the basis of the constitutional attack is due process or equal protection")), and embraced its prior determinations that unpreserved complaints regarding constitutionally protected parental rights were subject to waiver. *Id*. (citing *Tex. Dep't of Protective & Regulatory Servs. v. Sherry*, 46 S.W.3d 857, 861 (Tex. 2001) (concluding constitutional right to assert paternity claim, not raised in trial court, was waived)); *see also In re K.A.F*., 160 S.W.3d 923, 928 (Tex. 2005) ("We have held that the rules governing error preservation must be followed in cases involving termination of parental rights, as in other cases in which a complaint is based on constitutional error."). The court then evaluated whether due process nonetheless required review of an unpreserved complaint regarding charge error in that termination case, by identifying and balancing the three factors delineated in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), and as required by *Lassiter,* 452 U.S. at 27, balancing the "net weight" of those factors against the presumption that our preservation law does not permit review of unpreserved error in civil cases. *In re B.L.D*., 113 S.W.3d at 352."

–18–

The third *Eldridge* factor, the risk of an erroneous deprivation of parental rights arising from application of our preservation of error rules, weighs against disregarding our error preservation rules. *A.E.J.*, at *12. The appointment of an ad litem is but one protection against erroneous decisions. *Id.* *See* TEX. FAM. CODE ANN. §§ 107.013, 107.021. The parental termination process includes an extensive statutory scheme intended to minimize the risk of erroneous deprivation.[9] The heightened burden of proof of clear and convincing evidence mandates a heightened standard of review for both legal and factual sufficiency challenges. *A.E.J.* at *12; *B.L.D.*, at 353–54. These statutory protections suggest a low risk of an erroneous deprivation of parental rights if our preservation rules are enforced with respect to the additional safeguard provided by the construct for an ad litem attorney appointment. *Id.* In *A.E.J.,* we concluded father's private interest was offset by the State's competing interests (best interest of children), and the risk of deprivation favors enforcing our preservation rules, finding the weight of these factors demonstrates that enforcing our preservation rules did not violate father's due process rights.

In the event the fact-specific analysis conducted in *Lassiter* and considered in *B.L.D.* is necessary, we conclude the facts here do not alter the net weight of the

---

[9] *See* TEX. FAM. CODE ANN. §§ 102.008, 161.101 (petition seeking termination of parental rights must provide full notice to all parties involved and prove statutory grounds for termination and that termination is in the child's best interest); *id.* at § 107.013(a)(1) (trial court must appoint counsel for indigent parents opposing termination); *id.* at § 161.001(b) (involuntary termination permitted only if clear and convincing evidence satisfies statutory requirements).

factors described above. As discussed herein, the court found that the mothers' interests were not adverse to the children's interests, finding the ad litem unnecessary. We conclude CH waived any complaint regarding the trial court's failure to appoint an ad litem by failing to raise it prior to trial, and that by following our error preservation rules, we do not deprive father of any due process right.

Even if we did not find waiver, we would affirm the trial court's factual finding in the Order of Termination recitation because the exceptions included in the statute abrogate the requirement of an ad litem here. CH relies on sister courts that, by their holdings, reject the facial import of the statute by holding "a trial court can seldom find that one party adequately represents the interests of the children involved or that their interests are not adverse." *K.M.M.*, 326 S.W.3d at 715; *see also Chapman v. Chapman*, 852 S.W.2d 101, 102 (Tex. App.—Waco 1993, no writ) (concurrent ability to adequately represent child's needs while also seeking to terminate other party's parental rights would be "rare situation"). Contrary to the implicit premise of these decisions, here we are not presented with any reason either mother sought to terminate father's rights except for the best interests of each child. On the entire record before us, we see no conflict between NH and her child L.J.H. or BPS and her children I.D.H and M.D.H. *See A.E.J.*, at *13.[10]

---

[10] *See also* cases cited therein *In re B.W.*, No. 02-19-00009-CV, 2019 WL 2041808, at *7 (Tex. App.—Fort Worth May 9, 2019, no pet.) (mem. op.) (mother's testimony that she sought to protect child from father with a history of family violence demonstrated mother's interests aligned with child's); *In re C.A.P.*, No. 04-12-00553-CV, 2013 WL 749825, at *2 (Tex. App.—San Antonio Feb. 27, 2013, pet. denied) (mem. op.) (no error in refusal to appoint ad litem in private termination case where mother sought to terminate

–20–

CH argues that the trial court makes no affirmative findings other than the Order of Termination recitations, and that the trial court's prior finding cannot be implied. The family code does not set any time requirement for entry of a written order confirming a court's prior finding that a party without interests adverse to the child will adequately represent the interests of the child. *In re M.D.S.*, 1 S.W.3d 190, 195–96 (Tex. App.—Amarillo 1999, no pet.) Where the final judgment and findings of fact contained the requisite finding, the court refused to presume on a silent record that the trial court failed to comply with its statutory mandate to make these findings prior to any full adversary hearing and placed the burden on the complainant to affirmatively show no finding was timely made. *Id*. at 196. *See also, A.E.J.*, at *13-14 (a written statement supporting the court's decision not to make section 107.021 appointments in post-hearing findings of fact were sufficient even though the determination was made at an unspecified pretrial hearing for which no record was made).

In conducting the *B.L.D.* analysis, construing the statutory language as written, in light of the express findings of the trial court in the Order of Termination, we resolve CH's second issue against him.

---

father's rights following his conviction for sexual assault of a different child); *In re T.L.W.,* No. 12-10-00401-CV, 2012 WL 1142475, at *3 (Tex. App.—Tyler Mar. 30, 2012, no pet.) (mem. op.) (no error in refusing to appoint ad litem where record reflected mother's primary interest in seeking father's termination was in best interest of her child); *In re R.J.C.*, No. 04–09–00106–CV, 2010 WL 816188, at *2 (Tex. App.—San Antonio Mar. 10, 2010, no pet.) (mem. op.) (no error in refusal to appoint ad litem and concurrent findings that mother adequately represented child's interest in termination proceeding premised on father's sexual assaults of mother's other children).

## IV. Legal & Factual Sufficiency of Evidence Supporting Termination

In his third point of error, CH asserts the evidence is legally and factually insufficient to uphold termination of his parental rights to his three children.

### A. Standards for Termination

While parental rights are of a constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent–child relationship, it also is essential that the emotional and physical interests of the child not be sacrificed merely to preserve that right. *Interest of A.C.*, 560 S.W.3d 624, 630 (Tex. 2018). The rights of parenthood are accorded only to those fit to accept the accompanying responsibilities. *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003). Because the primary focus of a termination suit is protection of the child's best interests, a parent may forfeit parental rights by his or her acts or omissions. *Interest of S.B.*, 597 S.W.3d 571, 581 (Tex. App.—Amarillo 2020, pet. denied) (citing *A.V.*, 113 S.W.3d at 361). The Texas Family Code balances the convergent and divergent interests of parent and child by adopting a two-part standard that permits termination of the parent–child relationship only if (1) the parent's acts or omissions satisfy at least one statutory ground for termination and (2) termination is in the child's best interest. *See* TEX. FAM. CODE ANN. §161.001(b)(1), (2); *A.C.*, 560 S.W.3d at 630. Recognizing that parent and child share a "commanding" and "fundamental" interest in preventing an erroneous termination of their relationship, both elements require "clear and convincing

–22–

evidence." *A.C.*, 560 S.W.3d at 630 (citing *Santosky v. Kramer*, 455 U.S. 745, 748, 758-59 (1982)). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. §101.007. The heightened burden of proof informs the standard we utilize in reviewing the trial court's decision. *A.E.J.*, at \*3. In reviewing termination findings, we determine whether, based on the entire record, a factfinder could reasonably form a firm belief or conviction that the parent violated one or more of the conduct provisions of section 161.001(b)(1) and that termination of the parent's parental rights would be in the best interest of the child. *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). Because findings to terminate parental rights under subsections 161.001(b)(1)(D) or (E) can affect parental rights to other children through subsection 161.001(b)(1)(M), due process requires courts of appeal to review and detail its analysis as to termination of parental rights under subsection (D) or (E) when challenged on appeal, even if the termination can be upheld on other grounds. *Interest of Z.M.M.*, 577 S.W.3d 541, 542–43 (Tex. 2019) (per curiam) (citing *Interest of N.G.*, 577 S.W.3d 230 (Tex. 2019) (per curiam)).

### B.    Legal and Factual Sufficiency

The heightened proof standard in termination cases alters the appellate standards of legal and factual sufficiency review in favor of standards that honor not only the elevated burden of proof, but also the deference an appellate court must

have for the factfinder's role. *A.C.*, 560 S.W.3d at 630 (citing *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002)). The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered. In conducting a legal-sufficiency review, the reviewing court cannot ignore undisputed evidence contrary to the finding but must otherwise assume the factfinder resolved disputed acts in favor of the finding. *A.C.*, 560 S.W.3d at 630-31; *J.F.C.*, 96 S.W.3d at 266. Evidence is legally sufficient if, viewing all the evidence in the light most favorable to the fact-finding and considering undisputed contrary evidence, a reasonable factfinder could form a firm belief or conviction that the finding was true. *Id.*

In reviewing the factual sufficiency of evidence under the clear-and-convincing standard, we consider and weigh disputed evidence contrary to the finding against all the evidence favoring the finding. *A.C.*, 560 S.W.3d at 631. Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true. *Id.* In making this determination, we must undertake an exacting review of the entire record with a healthy regard for the constitutional interests at stake, while still providing due deference to the factfinder who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses. *In re A.B.*, 437 S.W.3d 498, 503

–24–

(Tex. 2014) (quoting *C.H.*, 89 S.W.3d at 25). Nonetheless, our review must not be so rigorous that the only findings that could withstand review are those established beyond a reasonable doubt. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam).

## C. Application of Law to Facts

The trial court made oral findings on the record at the conclusion of the parental termination trial. CH filed no request for findings of fact and conclusions of law. *See* TEX. R. CIV. P. 296. Both the court's oral findings and Order of Termination included findings by clear and convincing evidence that 1) CH has engaged in conduct that meets four statutory grounds for parental termination under subsections (b)(1)(C), (D), (E), and (F) of Texas Family Code section 161.001, and 2) termination of CH's parent-child relationships was in the best interest of his three children. CH challenges the legal and factual sufficiency of evidence supporting the four statutory grounds and the best interest finding.

### 1. Sufficiency of Statutory Findings Supporting Termination

The trial court made findings that, if supported by sufficient evidence, would satisfy the following provisions of the Texas Family Code:

> (b) The Court may order termination of the parent-child relationship if the court finds by clear and convincing evidence:
>     (1) That the parent has:
>
> * * *
>
>         (C) voluntarily left the child alone or in the possession of another without providing adequate support of the child and remained away for a period of at least six months;

–25–

(D) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child;

(E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child;

(F) failed to support the child in accordance with the parent's ability during a period of one year ending within six months of the date of the filing of the petition.

TEX. FAM. CODE ANN. § 161.001.

Because we are required to address section 161.001(b)(1)(D) or (E) grounds even if parental termination can be upheld on another ground, we first address CH's arguments that evidence was legally and factually insufficient to satisfy section 161.001(b)(1)(E). *See Z.M.M.*, 577 S.W.3d at 542–43. CH contends the only statutory ground for parental termination pled by BPS was that CH had engaged in a pattern of domestic violence that endangered the physical and emotional well-being of the children. *See* TEX. FAM. CODE ANN. §161.001(b)(1)(E). NH alleged both subsection (D) and (E) statutory grounds. CH argues the trial court only could have found evidence supporting these grounds by believing the testimony of both BPS and NH, which he contends is not credible.

### a.     Legal Sufficiency of the Evidence

The trial court found that CH engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered their physical or emotional well-being. TEX. FAM. CODE ANN. §161.001(b)(1)(E). A finding of endangerment under (E) requires evidence that the endangerment resulted from the

parent's conduct, including acts, omissions, or failures to act. *Interest of P.W.*, 579 S.W.3d 713, 725-26 (Tex. App.—Houston [14th Dist.] 2019, no pet.). Termination under (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *Id.* Scienter is not required for an appellant's own acts under section 161.001(b)(1)(E), although it is required when a parent places his child with others who engage in endangering acts. *Interest of E.A.R.*, 583 S.W.3d 898, 911 (Tex. App.—El Paso 2019, pet. denied.)

While endanger means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, the statute does not require that conduct be directed at a child or that the child actually suffer injury. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) (citing *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). The specific danger to the child's well-being may be inferred from the parent's misconduct alone. *Boyd*, at 533. The endangering conduct may include the parent's actions before the child's birth while the parent had custody of older children. *J.O.A.*, at 345.

BPS described to Dr. Albritton a long history of CH's abusive behavior toward her and their two daughters, including one instance of sexual assault by CH shortly after she gave birth.[11] BPS said that CH had pushed her, body slammed her,

---

[11] Dr. Albritton's 60-page report was admitted into evidence.

choked her, tripped her, and stomped on her. During this time, BPS testified that she called 911 about CH's behavior once, but CH knew the two officers who arrived, and no action was taken. She also called CPS about other issues occurring in the household, but again no action was taken. BPS felt trapped and unable to leave the relationship.

NH maintains that CH committed multiple acts of domestic violence against her. NH testified that CH sexually assaulted her less than two weeks after L.J.H. was born and provided medical records of reconstructive surgery she alleged was necessitated by the assault. The record includes NH's calendar and timeline documenting her descriptions of CH exhibiting paranoid and aggressive behavior, alcohol and drug induced tirades, threats to kill NH and himself, acts of violence against family pets, and ten specific instances of physical violence against NH. The children witnessed some of these acts. The alleged physical abuse included four instances of sexual assault. CH was accused of a March 18, 2017, sexual assault against NH and he pled guilty to the lesser included offense of assault causing bodily injury, with a family violence finding pursuant to TEX. CODE CRIM. PROC. ANN. art. 43.018. CH served 198 days in county jail.

Evidence of domestic violence may be considered as evidence of endangerment under subsection (E). *P.W.*, at 727 (citing *In Interest of K-A.B.M.*, 551 S.W.3d 275, 286 (Tex. App.—El Paso 2018, no pet.)). Violent conduct by a parent toward the other parent may produce an environment that endangers the physical or

–28–

emotional well-being of a child. *P.W.*, at 727 (citing *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.)). Domestic violence, want of self-control, and propensity for violence may be considered as evidence of endangerment. *P.W.*, at 727 (citing *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.)). A court may infer from a father's guilty plea to aggravated sexual assault of his stepdaughter that father engaged in conduct that will endanger or jeopardize the physical or emotional well-being of other children in the home who may discover the abuse or be abused themselves. *In re Baby Boy R.*, 191 S.W.3d 916, 926 (Tex. App.—Dallas, pet. denied), *cert. denied* 549 U.S.1080 (2006) (evidence legally and factually sufficient to support a 161.001(b)(1)(E) endangerment finding).

While not witnessing obvious acts of physical violence against the children, NH described L.J.H.'s screams and crying while CH bounced him on his lap as an infant and handprints or bruises found on the girls after being with CH. BPS shared that I.D.H. broke her arm while in CH's care with inconsistent stories offered as to the cause. Both NH and BPS described potentially frightening and emotionally abusive behavior by CH toward the children, including CH putting handcuffs on the girls and refusing to remove them until NH agreed to wear them, CH's verbal abuse and calling all three children profane names, throwing toys at the girls and smashing larger toys against their bedroom wall in an angry tirade while they were in their beds, and CH generally playing too rough with the girls and with infant L.J.H.

BPS described a household with boundary issues surrounding modesty where the girls were encouraged to go "nakey" and where both CH and his mother often walked around the house naked in front of her, the children, and his stepfather. Later CH insisted on sleeping naked with the children. BPS noted frequent physical aggression between CH and his mother, and she saw the stepfather watching pornography on the internet. Both NH and BPS testified that CH had told her his mother was physically abusive to him during his childhood.

When asked about good and bad touching during Dr. Albritton's individual interview L.D.H. made an outcry that her grandmother, CH's mother, had touched her private parts on one occasion and told her not to tell anyone. BPS is particularly concerned about I.D.H.'s allegation, as she would sometimes wake up and find I.D.H. in bed with CH's mother with both naked. NH also testified that she had witnessed I.D.H. sleeping in the same bed with the grandmother and had voiced her disapproval to CH, who had been ineffective at ending the practice.

Sexual abuse of a child endangers that child's physical or emotional well-being, and predatory or harmful conduct directed at one child will support termination of parental rights as to a different child, because all children at risk for the same conduct by the same predator are endangered. *See A.E.J.* at *7 (citing *In Interest of S.H.*, No. 02-17-00188-CV, 2017 WL 4542859, at *10 (Tex. App.—Fort Worth Oct. 12, 2017, no pet.) (mem. op.) ("a parent's endangering conduct toward other children is relevant to a determination of whether the parent engaged in

behavior that endangered the child that is the subject of the suit"); *Interest of S.G.*, No. 01-18-00728-CV, 2019 WL 1448870, at *1 (Tex. App.—Houston [1st Dist.] Apr. 2, 2019, pet. denied) (mem. op.) (termination premised on physical and emotional danger posed by parent convicted of aggravated assault of a different child)). Evidence was legally and factually sufficient to support termination of parental rights to all children based on a section 161.001(b)(1)(E) endangerment finding against a father who allegedly admitted taking sexually inappropriate photos of his sleeping stepdaughter on more than one occasion, even though he later denied taking the photos, claimed the mother was trying to frame him, and criminal charges were dropped. *See A.E.J.*, at *7-8.

CH currently lives with his mother and stepfather. Dr. Albritton concluded there are serious questions whether CH can establish boundaries that would protect the children from potential abuse in light of I.D.H.'s outcry. Evidence was legally and factually sufficient to support a 161.001(b)(1)(E) endangerment finding where a father took no steps to mitigate the damage his acts caused to his stepdaughter or his three biological children. *See A.E.J.*, at *7-8.

After reviewing the entire record in the light most favorable to the factfinding and considering undisputed contrary evidence, we conclude that a reasonable factfinder could form a firm belief or conviction that CH violated section 161.001(b)(1)(E). Accordingly, we find the evidence legally sufficient to support the trial court's finding that CH engaged in conduct or knowingly placed the children

with persons who engaged in conduct which endangered their physical or emotional well-being in violation of family code section 161.001(b)(1)(E).

**b.    Factual Sufficiency of the Evidence**

In reviewing the factual sufficiency of evidence under the clear-and-convincing standard, we consider and weigh disputed evidence contrary to the finding against all the evidence favoring the finding. *A.C.*, 560 S.W.3d at 631.   CH contends expert witnesses Dr. Albritton and Dr. Weatherly[12] took as true the word of NH and BPS regarding their allegations of CH's physical abuse and argues the factfinder should not have done the same.  CH questions NH and BPS' motivations, identifying the following inconsistencies and evidence contrary to the trial court's findings:

- BPS's affidavit that alleges CH raped her soon after childbirth is not credible because there was no allegation of CH's abuse in BPS's custody suit and the new allegation was made soon after NH filed her affidavit alleging a similar post-childbirth rape.

- BPS sent texts and Facebook posts describing CH as a great father and a good man after the time she now claims CH abused her.  BPS's testimony that she disclosed the abuse in her prior custody suit is not worthy of belief because neither the custody evaluator nor her counsel raised the issue.

- NH's fourteen-page affidavit to support her first application for a protective order failed to include CH's alleged sexual assault soon after delivery, and NH additionally did not mention the alleged sexual assault when she gave sworn testimony two weeks later at the protective order hearing.

---

[12] CH and NH attended two counseling sessions with Dr. Weatherly in late 2015.  NH resumed counseling with Dr. Weatherly in January 2018.

- The allegations of CH's sexual assault of BPS and NH were not made until after CH filed certificates with the court that he had completed a batterer's intervention program and parenting class—classes that would support a future request for CH to see his children.

- While CH was charged with sexual assault of BPS and NH and held in jail for 198 days, the charges ultimately were dismissed. The District Attorney's Office additionally issued a disclosure letter stating that NH's story did not match her medical records. CH argues the letter and dismissals are evidence the District Attorney did not believe these women.

- CH asserts NH was on a "crusade to destroy" him evidenced by her falsely accusing CH of two protective order violations to gain an advantage in their custody suit and harass him. CH was arrested but the charges were later dismissed upon finding the protective order specifically allowed CH to go to his parent's home.

- As evidence that BPS and NH lied about CH spitting in food when he was a teenager employed by a restaurant, CH produced the owner to whom BPS and NH allegedly reported this behavior and she testified she never received any such report about CH.

An exhaustive review of the appellate record presented includes testimony and documentary evidence disputing CH's above characterizations of the evidence.

CH asserts that Dr. Albritton's failure to recommend termination of parental rights and his creation of a plan to reintroduce CH safely into his children's lives is further evidence showing the trial court erred in finding the evidence sufficient to terminate his parental rights. Dr. Albritton made recommendations to the court regarding conservatorship if the court chose not to terminate CH's parental rights. His report further stated that "[d]ecisions regarding termination are considered under the purview of the Court" listing factors "consistent with termination decisions that surfaced during this evaluation." Dr. Albritton made a section 161.001(b)(1)(E) finding that it "appears that [CH] has engaged in conduct or knowingly placed the

children with person who engaged in conduct which endangers the physical or emotional well-being of the child."[13] Dr. Albritton found that CH has generally demonstrated an inability to provide the children with a safe environment, has not provided for the children financially in an appropriate manner, knowingly engaged in criminal conduct that resulted in a finding of family violence and incarceration, and more likely than not sexually assaulted the other parent. Dr. Albritton concluded that CH appears to have a mental or emotional illness that renders him unable to provide for the physical, emotional, and mental needs of the children and that he has not exercised all available options for remediation and treatment.

Considering and weighing the disputed evidence contrary to the finding against all the evidence favoring the finding, giving due deference to the trial court's findings, and after an exacting review of the entire record with a healthy regard for the constitutional interests at stake, we conclude that in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is not so significant that a factfinder could not reasonably have formed a firm belief or conviction that CH engaged in the conduct described in subsection 161.001(b)(1)(E). *See A.B.*, at 503; *J.O.A.*, at 345. Thus, the trial evidence stands factually sufficient to support the trial court's endangerment finding. Because we conclude the evidence is legally and factually sufficient to support the trial court's

---

[13] While noting that there were no dispositive findings from an objective source, Dr. Albritton stated that the household where CH currently lives with his parents was reported to be unsanitary, abusive, and emotionally unstable.

–34–

finding under section 161.001(b)(1)(E), we do not address CH's arguments that the evidence is legally and factually insufficient to support the trial court's finding under subsection (D). *See P.W.*, at 728.

### 2. Best Interest of Children Finding

CH challenges the second termination prong—best interests—which is child-centered and focuses on the child's well-being, safety, and development. *In re A.C.*, 560 S.W.3d at 631. A best-interest determination is guided by several non-exclusive factors, including: (1) the child's emotional and physical needs; (2) the emotional and physical danger to the child now and in the future; (3) the parental abilities of the individuals seeking custody; (4) the plans for the child by those individuals and the stability of the home; (5) the plans for the child by the agency seeking custody and the stability of the proposed placement; (6) the parent's acts or omissions that may indicate the existing parent–child relationship is improper; and (7) any excuse for the parent's acts or omissions. *Id.* (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)); TEX. FAM. CODE ANN. § 263.307 (listing additional best-interest factors). The *Holley* Factors are not exhaustive; some listed factors may be inapplicable to some cases. *C.H.*, at 27. Undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of meager evidence relevant to each factor will not support such a finding. *Id.* Proof of acts or omissions providing grounds for termination under Section 161.001(b)(1) does not relieve the

petitioner from proving the best-interest element, but the same evidence may be probative of both. *A.C.*, at 631-32; *C.H.*, at 28. We recognize that "best interest" is a term of art encompassing a much broader facts-and-circumstances based evaluation than a finding of harm or neglect, and the factfinder is accorded significant discretion. *See A.E.J.* at *8 (citing *In re Lee*, 411 S.W.3d 445, 460 (Tex. 2013)). A parent's best interest has no role in this analysis, and the non-exclusive *Holley* factors provide guidance rather than a checklist. *See A.E.J.,* at *8.

### a. The children's desires

CH argues that no testimony was offered regarding his daughters' desire to have a relationship with him, therefore the court's factual finding that I.D.H. and M.D.H. have no desire to have a relationship with him is unsupported by the record and could only be the trial court's opinion. While Dr. Albritton's custody evaluation concluded that CH's daughters "appear to have overheard a negative narrative regarding their father, based on comments from [NH] and [BPS]," and that this "contributes to a less reliable assessment of their relationship with their father," the evaluation summarized statements made by I.D.H. and M.D.H. to Dr. Albritton. In a joint interview, I.D.H. and M.D.H. agreed that they do not want to see CH because he might take them away from their mother, noting their mommy told them this and that NH does not like their father because he hurt her. In I.D.H.'s individual interview, she denied any coaching with the exception that she was supposed to talk and be honest. I.D.H. admitted that her mother and NH said negative things about

her father. When asked for three magic wishes, she said that she would like to stay in Oklahoma [with BPS and her stepfather], have NH close by, and never see CH again. In M.D.H.'s individual interview, when asked what she was supposed to tell the evaluator, she said that her mother had told her to be honest. She described NH as nice and, when asked what would happen if she would see her father [CH], she volunteered that she would run away. At trial, Dr. Albritton testified that his opinions were not merely based upon his belief in the truth of all of NH and BPS's statements, and that there was enough evidence of domestic violence and CH's mental instability to support his independent observation that the children had reason to fear CH even without hearing NH and BPS make negative comments about him.

> **b. The children's emotional and physical needs and emotional and physical danger, now and in the future**

All evidence supporting the endangerment finding against CH also serves as evidence of CH's inability to meet his children's emotional and physical needs and indicates a risk of future endangerment.

> **c. The parties' respective parenting abilities and programs available to promote the children's best interest**

Dr. Albritton concluded that psychological testing, clinical interviews, and collateral data converge to suggest that CH is struggling with significant psychological issues, including paranoid thought, distortion of reality, and social isolation. While his profile and interviews were not conclusive regarding abusive behavior, Dr. Albritton concluded the prior family violence finding and

misrepresentations of fact suggest CH is less than candid, and his profile is consistent with a person who was raised in an abusive home. Dr. Albritton also conducted psychological testing, clinical interviews and collected collateral data on NH, BPS and BPS's husband. While BPS exhibited an overly energized state and her testing suggests she may at times demonstrate hypervigilance and impulsivity, overall, she is an adequately functioning individual. Dr. Albritton concluded that her earlier poor judgment could have been due to a chaotic childhood and that collateral sources agree her stability and judgment is improving. His home observation revealed weaknesses in organization but concluded that BPS is an involved and attentive mother. At trial, Dr. Albritton testified that BPS's ability to balance her Naval career with the care of her four children without difficulty was "impressive."

NH's psychological testing suggested inflexibility and lack of insight, but Dr. Albritton notes her lack of emotional awareness has been significantly compounded by an emotionally and physically abusive relationship with CH and that consultation with her therapist indicated an improved level of assertiveness. Her consistent employment with good reviews shows her ability to work with others and increasing stability, while his observation and collateral data indicate she is an attentive and nurturing parent with no deficits in parenting ability.

The record shows that NH has continued her therapy with Dr. Weatherly. By contrast, CH only completed the initial 10-session domestic violence and father's program. CH has not followed the recommendations from the doctor who performed

his initial psychiatric evaluation to take medication for depression and seek additional therapy for a potential personality disorder. He similarly disagrees with Dr. Albritton's recommendation of at least four years of individual therapy.[14] His only concession was a potential willingness to seek some help on the narrow issue of how to resume a relationship with his children should his rights not be terminated. Where a mother allowed her mental-health issues to go unaddressed, the trial court reasonably could have considered her mental state as endangering the child's well-being. *P.W.*, at 727 ("When a parent's mental state allows [the parent] to engage in conduct that endangers the physical or emotional well-being of the child, that conduct has bearing on the advisability of terminating the parent's rights."); *In re S.R.*, 452 S.W.3d 351, 365 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (parent's failure to comply with services to improve mental health and parenting relevant to endangerment). We conclude CH has not taken advantage of available programs to assist in promoting the children's best interests.

### d. The parties' respective plans for the children and stability of the homes

A parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *P.W.*, at 726. After being fired from his position with the county jail, CH has had periods of unemployment

---

[14] CH testified that he does not intend to seek individual therapy because he does not believe his mother's opinion that he has suffered from depression since a teenager nor the doctors' opinions that he needs therapy.

and was forced to move back to his parents' home. While the home was clean at the time of Dr. Albritton's home visit, both BPS and NH had reported unsanitary conditions in the past. BPS described the house as deplorable, as there were seven dogs and three cats at one time, and NH described the girls playing on the floor next to dog feces and introduced photos of unsanitary conditions into evidence.

CH asked for unsupervised possession of his children, plans to add a bed in a small room at his parents' home, and generally dismisses I.D.H.'s outcry of sexual abuse against his mother as insane. At the time of trial, CH testified that he works at the Wal-Mart distribution center and has access to health insurance for the children but admits that he has not paid child support or contributed financially to any of his children over the past three years, even when not incarcerated. When asked about the lack of financial support, birthday cards, or even inquiries regarding his children that could have been made through counsel, CH voiced a belief that all were prohibited by the protective orders.

### e. Parent's acts or omissions relevant to existing parent-child relationships and any related excuses

The same facts relevant to endangerment, as well as evidence related to the children's emotional and physical needs and parenting abilities also inform this factor. Because of the protective orders, CH has not seen I.D.H. or M.D.H. in three years and has not been part of L.J.H.'s life since he was an infant. We conclude that evidence in the record of CH's emotional and possible physical abuse of the children, his continued willingness to allow his children to sleep in his mother's home after

I.D.H. made the outcry of sexual abuse against her that has not been dispelled, his failure to provide any financial support for his children, his failure to seek therapy or available parenting programs to improve his parenting abilities, and his efforts to blame others for his relationship issues and job losses all support termination pursuant to these factors.

We find the evidence legally and factually sufficient to support the trial court's findings that termination of CH's parental relationship is in the best interest of L.J.H., I.D.H., and M.D.H. We resolve Appellant's third issue against him.

## V. Sufficiency of Evidence Supporting Lifetime Final Protective Order

In his fourth point of error, CH contends the evidence is insufficient to uphold the lifetime protective order the trial court issued in favor of his three children—I.D.H., M.D.H., and L.J.H.

### A. Applicable Law

When the trial court acts primarily as a factfinder, we review its determinations under the legal and factual sufficiency standards. *Lewis v. Yancy*, No. 01-19-00348-CV, 2020 WL 7251448, at *4 (Tex. App.—Houston [1st Dist.] Dec. 10, 2020, no pet.) (mem. op.) (citing *In re Doe*, 19 S.W.3d 249, 253 (Tex. 2000)). When a party who does not have the burden of proof at trial challenges the legal sufficiency of the evidence, we consider all of the evidence in the light most favorable to the prevailing party, indulging every reasonable inference in that party's favor and disregarding contrary evidence unless a reasonable factfinder could not.

–41–

*City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). In reviewing a court's findings supporting a protective order for factual sufficiency, we weigh all of the evidence in the record and set aside the challenged finding only if it is so contrary to the overwhelming weight and preponderance of the evidence that it is clearly wrong and manifestly unjust. *Maples v. Maples*, 601 S.W.3d 23, 27 (Tex. 2020). The trier of fact is the sole judge of the weight and credibility of the witnesses' testimony. *Id.*

### 1. Family Violence Findings

The Texas Family Code provides that a court shall enter a protective order if it finds that family violence[15](1) has occurred and (2) is likely to occur in the future. TEX. FAM. CODE ANN. §§ 81.001, 85.001. "The purpose of the protective order statute is not to remedy past wrongs or punish prior criminal acts; rather, it seeks to protect the applicant and prevent future violence." *Roper v. Jolliffe*, 493 S.W.3d 624, 634–35 (Tex. App.—Dallas 2015, pet. denied). Courts should broadly construe the family code's protective order provisions to effectuate its humanitarian and preventative purposes. *Maples*, at 28. In parental termination and child custody cases, as well as cases involving protective orders against family violence, courts recognize that often past is prologue so one incident of family violence permits an inference that the person will continue this behavior in the future. *Maples*, at 28

---

[15] "Family violence" is defined, in pertinent part, as: an act by a member of a family or household against another member of the family or household that is intended to result in physical harm, bodily injury, assault, or sexual assault or that is a threat that reasonably places the member in fear of imminent physical harm, bodily injury, assault, or sexual assault, but does not include defensive measures to protect oneself. *Id.* § 71.004(1).

(even though father never threatened mother or children's lives, evidence factually sufficient to support finding that father likely to commit future family violence based on mother's testimony regarding one incident of physical abuse toward her, as well as evidence he threatened to "get back at" mother, was verbally abusive toward children, and left loaded guns where children had access). In addition to acts intending physical harm, threats that reasonably place the victim in fear of imminent harm constitute family violence. *See, e.g., Boyd v. Palmore*, 425 S.W.3d 425, 430–31 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (concluding that appellant committed act of family violence when he blocked appellee's car with his body and jumped on hood of car); *Clements v. Haskovec*, 251 S.W.3d 79, 85–86 (Tex. App.—Corpus Christi-Edinburg 2008, no pet.) (concluding that appellant committed act of family violence by raising his fist and making other threats though he never actually struck family member).

CH does not directly dispute the trial court's findings that family violence occurred and is likely to occur in the future, but he does challenge the sufficiency of evidence to support the protective order for his three children. CH pled guilty to assaulting NH with bodily injury, an offense that carried with it a family violence finding. The evidence previously discussed that supported CH's termination of parental rights also support a family violence finding. We conclude the evidence is legally and factually sufficient to support the court's family violence findings in the lifetime protective order.

## 2. Duration Exceeding Two Years

Texas Family Code Section 85.025(a) states that "[e]xcept as otherwise provided by this section, an order under this subtitle is effective: (1) for the period stated in the order, not to exceed two years; or (2) if a period is not stated in the order, until the second anniversary of the date the order was issued." TEX. FAM. CODE ANN. § 85.025(a). Section 85.0025(a-1), however, states that the duration of a protective order may exceed two years under certain circumstances:

> (a-1) The court may render a protective order sufficient to protect the applicant and members of the applicant's family or household that is effective for a period that exceeds two years if the court finds that the person who is the subject of the protective order:
> (1) committed an act constituting a felony offense involving family violence against the applicant or a member of the applicant's family or household, regardless of whether the person has been charged with or convicted of the offense;
> (2) caused serious bodily injury to the applicant or a member of the applicant's family or household; or
> (3) was the subject of two or more previous protective orders rendered:
> (A) to protect the person on whose behalf the current protective order is sought; and
> (B) after a finding by the court that the subject of the protective order:
> (i) has committed family violence; and
> (ii) is likely to commit family violence in the future.

TEX. FAM. CODE ANN. § § 85.025(a-1). Section 85.001(d) provides that if a court renders a protective order for a period of more than two years, the court must include in the order a finding described by Section 85.025(a-1). TEX. FAM. CODE ANN. § 85.001(d).

–44–

### B. Application of Law to Facts

#### 1. Findings Made in Lifetime Final Protective Order

CH first contends that the Lifetime Final Protective Order is defective on its face because it does not contain the findings required by Section 85.001(d).

The Lifetime Final Protective Order signed on March 18, 2021, contains the following findings:

> #### 5. *Findings*
> . . . .
> The Court finds that the child, [L.J.H.], is the child of Applicant [NH], and Respondent, [CH]. The Court further finds that the parent-child relationship between [CH] and [L.J.H.] was orally terminated on December 8, 2020.
> . . . .
> The Court finds that [I.D.H.] and [M.D.H.] are the children of Respondent [CH] and [BPS]. The Court finds that [I.D.H.] and [M.D.H.] were members of Applicant's family and household. The Court further finds that the parent-child relationship between [CH] and [I.D.H.] was orally terminated on December 8, 2020. The Court finds that the parent-child relationship between [CH] and [M.D.H.] was orally terminated on December 8, 2020.
> The court finds that family violence has occurred and that family violence is likely to occur in the future. The Court finds that Respondent, [CH], has committed family violence. The Court finds that the following lifetime protective orders are for the safety and welfare and in the best interest of Applicant, [NH, LJH, I.D.H., and M.D.H.], and are necessary for the prevention of family violence.
>
> * * *
>
> #### 13. *Effective Period*
>
> Pursuant to Section 85.025 of the Texas Family Code, Respondent, [CH], committed an act constituting a felony offense involving family violence against [NH], regardless of whether the person has been charged with or convicted of the offense.

> Pursuant to Section 85.025 of the Texas Family Code, Respondent, [CH], committed an act constituting family violence against [L.J.H., I.D.H., and M.D.H.].
>
> The Court finds that Respondent, [CH], caused serious bodily injury to [NH, L.J.H., I.D.H. and M.D.H.].

If supported by evidence, these findings satisfy the finding requirements of Texas Family Code section 85.025 (a-1)(1) and (2) to justify a protective order exceeding a two-year duration under section 85.001(d). *See* TEX. FAM. CODE ANN. §§ 85.001(d); 85.025(a-1).

### 2. Sufficiency of Evidence Supporting Findings

CH asserts the evidence is insufficient to satisfy the statutory requirements of a protective order that exceeds a two-year duration. *See* TEX. FAM. CODE ANN. §§ 85.001(d); 85.025(a-1). First, CH contends the trial court failed to make the required statutory findings to justify the protective order's duration, arguing that no findings of fact or conclusions of law were issued,[16] and the court's oral findings at the hearing were insufficient because they failed to specify which subsection of 85.025(a-1) was proven at trial. When a party challenges a protective order that *itself contains* a requisite finding by complaining the court did not previously make the requisite finding on the hearing record, failure to object to the court's omission at trial waives this complaint on appeal. *See Martin v. Parris*, No. 06-10-00037-CV, 2011 WL 766653, at *4 (Tex. App.—Texarkana Mar. 4, 2011, no pet.) (mem. op.)

---

[16] We have previously noted that none were requested.

–46–

(stating that even if complaint had been preserved, appellate court would have construed court's oral finding that appellant's conduct would constitute an endangerment to the children as a finding that family violence would likely occur in the future).

The record shows that the trial court's oral findings regarding the lifetime protective order were made immediately after oral findings regarding evidence justifying CH's parental termination. Before the trial court began stating findings, the court made clear that in addition to testimony, the court had reviewed all exhibits and had "read every page of every document that you've submitted." Regarding the lifetime protective order, the trial court stated "I do find that family violence has occurred and that family violence is likely to occur again in the future," and "I also find that the facts are sufficient to justify the requests for a lifetime protective order for [NH, L.J.H. who will be L.J.M., for I.D.H., and M.D.H.]. And those requests for a lifetime protective order are granted."

CH contends there is no evidence in the record that NH suffered serious bodily injury to support the lifetime protective order. *See* TEX. FAM. CODE ANN. § 85.025 (a-1)(2). NH testified that reconstructive surgery was necessary after CH sexually assaulted her and NH entered her medical records into evidence. CH argues that, even assuming NH's surgery was required due to a sexual assault, the evidence does not satisfy the Texas Penal Code's definition of "serious bodily injury" because there was no testimony that NH experienced a substantial risk of death, serious permanent

–47–

disfigurement, or protracted impairment of the function of a bodily member or organ.

We need not evaluate whether the evidence supports a violation of subsections 85.025 (a-1)(2) or (3), as the Lifetime Final Protective Order also contained a finding that CH "committed an act constituting a felony offense involving family violence against [NH]," which independently supports an order granting a protective order with a duration beyond two years. *See* TEX. FAM. CODE ANN. § 85.025 (a-1)(1).

CH contends the only evidence the Court could use to find the requirements of Section 85.025 had been met was NH's allegation that he sexually assaulted her in September 2017. Sexual assault as described by NH is a felony offense. TEX. PENAL CODE ANN. §22.011. In addition to NH's testimony, Dr. Weatherly testified that NH discussed this sexual assault in therapy sessions. CH characterizes NH's return to therapy in January 2018 as contrived for the divorce and protective order proceedings. The court as factfinder was the sole judge of the weight and credibility of the witnesses' testimony, and as such was entitled to disregard CH's denial and believe NH's allegation of sexual assault. *See Maples*, at 27 (mother's testimony that father waived around and discharged a handgun during incident where he also hit and kicked her was factually sufficient for factfinder to conclude father had committed aggravated assault, a felony that satisfies 85.025(a-1)(1)). We find the evidence is legally and factually sufficient to support the court's finding that CH committed an act constituting a felony offense involving family violence against

–48–

NH, regardless of whether CH has been charged with or convicted of the offense to satisfy family code subsection 85.025 (a-1)(1).

CH next argues that NH's allegation of sexual assault could not support a lifetime protective order for any of the children because no reasonable factfinder could have found NH credible, asserting her medical records and prior testimony contradicted her allegations. NH explained at trial that she did not tell medical professionals about the sexual assault because CH had threatened to "do it again" and kill her if she told anyone. Neither code of criminal procedure chapter 7A nor family code chapter 85 require that a criminal conviction be obtained to justify a protective order exceeding a two-year duration. *Beach v. Beach*, No. 01-19-00123-CV, 2020 WL 1879553, at *4 (Tex. App.—Houston [1ˢᵗ Dist.] Apr. 16, 2020, pet. dism'd w.o.j.) (mem. op.) (finding evidence legally and factually sufficient to support trial court's finding that applicant was victim of stalking to justify 99-year protective order). Sworn testimony of an applicant can be sufficient evidence for a court to grant a protective order. *See Amir-Sharif v. Hawkins*, 246 S.W.3d 267, 272 (Tex. App.—Dallas 2007, pet. dism'd w.o.j.) (rejecting argument evidence was insufficient to grant protective order absent corroborating police records, photographs, or medical records). Children can be "protected parties" of a protective order exceeding two-years duration and the grounds justifying the duration do not have to be directed at the children because, upon making the requisite findings applicable to the applicant, section 85.025(a-1) statutorily authorizes a court to issue

–49–

a protective order sufficient to protect members of the applicant's family or household. *Onkst v. Morgan*, No. 03-18-00367-CV, 2019 WL 4281913, at *9 (Tex. App.—Austin Sept. 11, 2019, pet. denied) (mem. op.) (evidence of father's prior protective order violations legally and factually sufficient to justify lifetime protective order for benefit of mother, child, and other members of mother's family).

CH asserts that NH's sexual assault allegation cannot support the lifetime protective order in favor of I.D.H. and M.D.H.—his children with BPS. He argues that BPS's application to extend a protective order contained no grounds for a lifetime protective order, so the trial court only could have granted relief pursuant to NH's application that included all three children. CH asserts that NH was not authorized to apply for a protective order on behalf of I.D.H. and M.D.H. because testimony established that I.D.H. and M.D.H. had not been a member of applicant NH's household for over two years prior to trial—they had been living with their mother BPS in another state. The statutory provision allowing a court to render a protective order of longer duration allows the court to render an order "sufficient to protect the applicant and members of the applicant's family or household." TEX. FAM. CODE ANN. § 85.025(a-1). The Family Code defines "household" as a unit composed of persons living together in the same dwelling without regard to whether they are related to each other. TEX. FAM. CODE ANN. § 71.005. Additionally, "member of a household" includes a person who previously lived in a household. TEX. FAM. CODE ANN. § 71.006. The record contains undisputed evidence that

–50–

I.D.H. and M.D.H. "previously lived" in a household with NH. Section § 85.025(a-1) places no additional time restriction upon "members of the applicant's family or household," therefore the definition of "member of a household" would include I.D.H. and M.D.H. We find the evidence legally and factually sufficient to support the trial court's finding that I.D.H. and M.D.H. were members of Applicant's household.

We resolve Appellant's fourth issue against him and affirm the trial court's judgment.

/Bonnie Lee Goldstein/
BONNIE LEE GOLDSTEIN
JUSTICE

210183F.P05



## Court of Appeals
## Fifth District of Texas at Dallas

### JUDGMENT

IN THE INTEREST OF L.J.H., A
CHILD, AND IN THE INTEREST
OF I.D.H. AND M.D.H.,
CHILDREN

No. 05-21-00183-CV

On Appeal from the 354th Judicial
District Court, Hunt County, Texas
Trial Court Cause No. 85395.
Opinion delivered by Justice
Goldstein. Justices Partida-Kipness
and Pedersen, III participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellees recover their costs of this appeal from appellant.

Judgment entered September 20, 2021.